First up is United States v. Jerry Hall. Mr. Boucher. May it please the Court. Good morning, Your Honors and Counsel. There are two reasons the images here used to apply the pattern enhancement do not constitute a lascivious exhibition and the production of child pornography, any more than had Mr. Hall cut out a picture of a young girl in a swimsuit or underwear ad from any magazine or online print. First, in both instances, whether it's the images here or images in a magazine, those images are not inherently salacious or what we would ordinarily associate with child pornography. And second, the fact that the images here in some instances are close-ups where in other instances can be cut out from a magazine, do not transform those otherwise images into a production of child pornography and lascivious exhibition. Yeah, of course, Counselor, you've got that. Let's address the part of your case that is most favorable to the government, which is the Holmes line of decision saying that the defendant's perspective and the defendant's conduct can make what was otherwise non-lascivious lascivious. Yes, Your Honor. Yes, Judge Carnes. And Holmes really does get to the heart of this issue because at bottom what we're dealing with is the line between what this Court said in Holmes is that an otherwise innocent depiction can be child pornography versus whether any image can turn into child pornography. Could I just ask one other point to what the Chief just said? Is it also correct that the environment in which you find the image has some bearing? Yes. Yes, Judge Clevenger. And what was the environment in which these photos were found? Yes. So to address both those questions in part and to deal with yours, Judge Clevenger, first, it's a very important distinction here. These images were found on the cell phone that was part of the uncharged conduct that was not part of the factual basis for the plea and the actual production of child pornography to which Mr. Hall actually pled guilty. But the way they were found on the cell phone and there were other things in the cell phone, including the identification of addresses that had been visited, correct? Yes. The access to the child pornography websites. And those addresses were suggested salacious conduct, right? That is part of the factual basis. I mean, no question about that? There's no question about that. I mean, I want to repeat them in public. Right. There actually are no factual disputes in this case as well. But it is important that the specific images here is elided from the factual basis of the plea, and it does distinguish between the images here and the line between what Judge Carnes is discussing and the Holmes decision. And going back to Holmes, Holmes is one piece of the — I just want a data point question. I don't know whether you have your brief with you. But on page 13 of the brief, the sentence begins, here the district court found two photographs taken from a video made by Mr. Hall. What does taken from a video mean? And I apologize if it's being imprecise here. And to give you the actual reference point in the record itself, on Doc 57, pages 25 through 28, the images here is one video and two separate pictures, bait stamps. I understand that. But the question taken from the video suggested to me that the video had been taken and then afterwards Mr. Hall had taken a frame out of the video and turned it into a photo. I apologize for that. That's imprecise. There was the only — the video here is just a standalone video, and the images are separate. They were separate photographs taken in the camera. Taken from the phone. Okay, well, taken from a video threw a curve to me. I'm sorry. I'm sorry I'm taking up your time. Yes. But — and now going back to the heart of this, which is Holmes. Now, Holmes is one piece of the puzzle because Holmes itself cites to Gerbowich and Williams, these courts' decisions, that what we're actually looking at is the definition of lascivious exhibition in the context of production of child pornography or sexually explicit conduct. So Holmes, in the context in which it's decided, is dealing with whether otherwise innocent depictions can be child pornography. And there it's very important that what we're dealing with is nude images that otherwise would be associated with what we would commonly understand to be child pornography. So an example similar to Holmes that — a common example I can think of is parents that take pictures of their children in the bathtub, for example. That, you know, in and of itself depicts nudity, but it's something that if a parent — Depends on what kind of picture it is. Exactly. And a picture in a bathtub just standing alone is not in an environment that gives any connotation to what the nature of the image is. Correct, Judge Clevenger. Other than a happy family. Correct, Judge Clevenger. And this is exactly what Holmes is dealing with because the argument in Holmes was that does not rise to the level of child pornography. And the Court — Right. But that's not what we have here. Exactly. We don't have a picture of an innocent child in a bathtub. What we have here is actually the flip side. What we have are images of children in a swimming pool dressed in age-appropriate clothing. There's no finding that that's of unnatural position, no finding of sexual coyness, no finding of any of — even if we were to look at what this Court looks at in the DOS factors and the pattern-jurying instructions, and most importantly, not what we would commonly associate with child pornography. To the Holmes point and what we were just discussing, even with an image, the key distinction is you would never find an image, like I just described, of a child in a bathtub in a magazine or otherwise. These images, you could. And that's very important because if you take the government's argument to its logical extreme, what it would say is under Holmes, any photo, including photos that would be distinct, as this Court exolved in Williams, any photo that has a sexual appeal to those that have a sexual desire in children could turn into child pornography. You're saying that the worst of these photographs could be found in a mainstream magazine? These — the images — well, if we're looking specifically at the Zoom aspect of it. So the Zoom is really — I don't care, Zoom, non-Zoom. You're saying the worst of these photographs could be still framed into a mainstream magazine? I believe, Your Honor. Well, there's really no finding here that these are images that — I'm sorry. Could the worst of these be found without surprise or shock in a mainstream magazine? That's a simple question. Yes. I do believe that these are comparable to images that you would otherwise — Including the one that shows the side view of her pubic area. Well, to be very clear, because I want to be clear to what the record actually depicts, those images, it does come close. But if you look at, you know, ads that we have in the park — We've seen the images. Yes. This week. So my question is, you're saying the side view of the pubic area, wouldn't be surprised to see that in a mainstream magazine? I don't believe that the image actually is — I don't care what you believe about the image other than answering my question. That would not surprise you to see that in a mainstream magazine? Unfortunately, I do think some of those images are comparable to what you would see in a Target magazine or J. Crew or otherwise. There are some images of girls in bathing suits. And the court here, though finding that the pants were loose, did not make a finding that there was actually a depiction of the pubic area itself or depict nudity, which is why I'm hedging a bit on Your Honor's question. I don't mean that — Yeah, but the district court made — the images are the images. Correct. The district court made some findings I don't think are correct. He said the girl was being talked to by another girl. You look at the video, and that's simply not true. There's another girl, and somebody's watching TV. I think one of them's watching TV. And what he took to be a conversation between the two girls clearly, to me, seems to be a conversation on television that the girl in question was watching. Am I wrong about that? No, I don't think you're wrong. And that's why I'm trying to be precise to what the district court found. I'm not concerned about what the district court found except to the extent that it affects our scope of review. I'm talking about the image itself. Correct. And I do think in — and what you're describing with the loose pants, that does run up to the line. I would concede that it would run up close to the line of child erotica, but that also is an important distinction because there is a concept that there are images that are close to the line, like child erotica, which are often found in child pornography cases, but even law enforcement makes that distinction. So there has to be, and this is where it comes to Holmes, there has to be a line between what could constitute child pornography and what could constitute otherwise images, whether it's child erotica or other images that are appropriate for or inappropriate to those that appeal to. The government concedes it's a close question. Was that in the PSR, I mean, in the response PSR in the district court or in the briefs here? They run together to me. The government conceded it was a very close question. Well, the posture of this, the PSR, the probation office, actually did not score the video that we're — Counsel, you seem to have a difficulty answering my questions. Where did the government make the concession that it was a close call? Oh, the government, I don't believe, made a concession that it was a close call. What I'm suggesting is the record here suggests that it's a close call, given that the probation office itself did not score this to be child pornography when the government made its objection in the PSR and the court itself when it observed these images. So not to suggest this is what the government says, but if you do give the context to the record itself, these images were not first put forward for the five-level enhancement. They were not brought forth until other parts of the record were found to be insufficient under the preponderance standard. And again, the probation office itself did not accede to the government's objection. So for those parts, that's why we're saying that it is a close call. But I would just leave, and I see my time is concluding, the Court with just this one is that under Holmes, if it is the case that any image based on the subjective intent can turn into child pornography, taking that to its logical extreme does mean that images in Target magazines, J.Crew, otherwise online, any of those could be classified as child pornography, and that seems to be a bridge too far. So we'd urge the Court to reconsider the lower court's decision, and I yield the remainder of my time. Thank you. Thank you, Counsel. Ms. Sider. May it please the Court. Jermaine Sider for the United States. Counsel, am I confabulating the fact that you all candidly conceded somewhere along the line that this was a close call? We've never conceded that this is a close call. You think it's not a close call? You think it's a slam-dunk winner for the government? I think it is not a close call that these are images that show a lascivious exhibition of the pubic area of a 7-year-old child. Based on the actions of the cameraman, the defendant? Correct. Based on the actions of the cameraman and all the circumstances surrounding the case. So you can have a photographer, a parent, taking a picture of children in the bathtub, two young children. Well, in that case, that wouldn't be a lascivious exhibition. Can I finish? Oh, yes. He's taking pictures of two young children. And in one hypothetical, it's a non-normal parent-child situation. In the other, it's a normal parent-child, except the parent is a pedophile. And the parent has lascivious thoughts in the second hypothetical. Is that child pornography? I think that could, that factor could factor into. No, I'm not asking you that. I'm asking you if it's child pornography. Exhibition of the genitalia or pubic area, children in the bathtub, that happens. Yes, that would. One hypothetical, normal parent-child, no pedophile. Second, normal parent-child, except the parent with the camera, is a pedophile. Doesn't zoom in, doesn't focus, doesn't laugh, doesn't do anything else. Just takes the same picture as the first one does. Yes. So you've got child pornography in the second hypothetical, but not the first one. Correct. That just cannot be. Well, because it shows that as evidence. Well, the evidence, for example, is here. When you have someone who is sexually interested in the child and the subject being filmed, that informs the lascivious nature of the image, because it makes it more likely that the intent of the image was to portray the child as a sexual object. And that is what distinguishes. But it's the same image. Right. But the circumstances surrounding the image are different. I thought one of the main motivations, and the Supreme Court has written on this and we've written on it a number of times, about harshly punishing child pornography was that the images never go away. They get on the Internet and they can be trafficked on the Internet and therefore the harm lasts forever. You're familiar with what I'm talking about? Yes. Okay. That doesn't depend on the mental operation or the thoughts of the cameraman, does it? The harm to the child? Yes. I think it could, yes. Go back to my hypothetical. First case, normal parents, no pedophile, no predatory thoughts. And somehow that gets on the Internet, not through their actions, but somebody else comes in and steals their computer or whatnot. Second case, same thing. Gets on the Internet, not because of either parent. Somebody steals their laptop, puts it on the Internet. Why does the harm to those children depend on the thought of the parent when they took the video? At the time they took the video, in the normal parent-child context, it wouldn't have been child pornography because at that time it wouldn't have been a lascivious act. I'm asking you why the harm to the child is different in those two circumstances. I think the harm to the child would change once someone has turned an innocent photo into something and treated it as lascivious. I haven't turned it on. I haven't turned it to anything. It's been posted on the Internet through no fault of hypothetical parents A or hypothetical parents B. Just got on the Internet. Okay. Why is the child's harm different in B than it would be on A? The answer is it's not, but it's still child pornography. That has to be your answer. You can't tell me that the harm to the child is different based on the subjective intent, motivation of the cameraman when the images, both identical, end up on the Internet. If you can, I'm willing to listen to you. I think it can because, well, I think it can, and I think this Court has held that those circumstances from the cameraman's intent does play into the factor as to whether a particular image is lascivious. I'm not talking about playing into the factors as to whether it's lascivious. I'm talking about the harm to the child that the Supreme Court and this Court have talked about, about the images being out there forever and the child knowing that people around the world or on the Web are viewing her nude photographs with lascivious enjoyment. That doesn't depend on the subjective motivation of the camera person. You may say it doesn't have to, but I don't see how or why you're trying to argue that it does. The people who view that, the pedophiles around the world who view that, could care nonetheless about whether the motivation of the cameraman was pure or impure. The harm is the same. Okay. I think my position is it doesn't matter in this case because the question is whether these images are lascivious exhibition of the pubic area or the genitals of the step. Let me ask you this. We seem to have assumed all along that the issue is clearly erroneous review, right? Yes. That's your position. You remember, I believe it was the Harris case where the Supreme Court had the qualified immunity road race case police chasing the fleeing felon and Judge Barquette for our court found certain things about the chase that were depicted in the video and it went up to the Supreme Court and the Supreme Court said we don't have to accept that. We've got the video. We can view the video and determine the facts ourselves. Are you familiar with that? I'm not familiar with that case. You'll have to take my word for it. Okay. I will. And there's been some discomfort about that holding in that case, which is basically forget about clearly erroneous or any deferential review. If the reviewing court has the video and the video tells it all, or the images, then it's basically de novo review as to what the facts portrayed on the theory that we can tell as well as the district court. If that is the law, and it is, or at least it was in Harris, wouldn't that apply here? We look at the images and make the decision ourselves. We can see everything the district court saw. I think you can see everything that the district court saw, but under the clearly erroneous standard of review, if there are two permissible ways of looking at something, then one of them wouldn't be clearly erroneous. So the question is whether you can reverse simply because you disagree, then that isn't the standard of review that we're operating under. That decision may have been Scott instead of Harris. I don't recall, but I'm certain that was the decision. And the discomfort that some of us felt about that is it's not just who's got the better perspective on it. Ordinarily, if the district court hears testimony, obviously the district court has the better perspective. It's not just that and the clearly erroneous standard, but it's also the allocation of functions. Appellate courts are better making a lot of fact determinations and law determinations, and that's their function. Their function is not to determine facts. And if you start shifting those burdens from the district court to the court of appeals, you misallocate time and resources and so forth. That's your best argument for why this court ought to apply a deferential factual review to the district court's findings as opposed to we know it when we can see it and we've looked at it. I agree. I thought you might. I want to make clear that this court can affirm the district court based on either one of two findings that the district court made. So Mr. Hall has to show that both of those are clearly erroneous, and he hasn't done so. One of the findings that the district court made was that Mr. Hall had produced a depiction showing a lascivious exhibition of the 7-year-old's pubic area when he videotaped the child in her swimsuit climbing onto a bar stool. And this video focuses on the child's pubic area and culminates in a close-up view of her pubic area. And the second separate finding that the district court made was that Mr. Hall had produced another depiction showing the lascivious exhibition of the genitals or pubic area of this 7-year-old child when he photographed her again in her swimsuit, but this time she's sitting on a couch. And because of her pose and the position of her swimsuit bottoms and the angle from which Mr. Hall had taken the photo, part of her pubic area is exposed and any person looking at that photo can see it. Either one of those findings supports the sentencing enhancement here, and neither one of them is clearly erroneous. I'll start with the video, because that is what Mr. Hall's brief has focused entirely on. This is a minute-long video where the first dozen seconds shows the child climbing onto a bar stool, and it is focused on her buttocks as she's climbing onto the stool. The remainder of the time is taken from her. It's fully clothed, however. What? She's fully clothed. She is fully clothed. She's fully clothed in her two-piece bathing suit. And the remainder of the video shows her seated on the bar stool, and it is focused and it's not focused on her face, which is hardly in this video. It's focused on her body and, more specifically, on her pubic area, which is in the center of the frame. Now, what if he's just not a very good cameraman or he's distracted and some of us aren't very good with videos? The notion whether or not, along the lines of the Chief's questions, whether this would be a lascivious display depends then on whether or not he was purposefully holding the camera for a second or two on her buttocks area, or if, in fact, he were a careless photographer, then it wouldn't be pornography. It depends. And that would be something for the fact finder to decide. But here we don't have carelessness. What we have is a deliberate. He closes in in the last dozen seconds. He moves in closer to the child. Isn't the zoom in 12 seconds long? He starts to move in in the last dozen seconds and then lingers. What are the total number of seconds of the video? I'm sorry, what? Total number of seconds of the video. The total number of seconds is 62 seconds. 62 seconds. And how many seconds were focused on the pubic area? I thought it was 12. Starting after the first dozen when she's seated on the bar stool for about 48 seconds, the focus is on the pubic area. And the last 12 seconds of that 48 seconds is when he starts to move in. Correct. But would it matter if he had gone to trial and if he had gone to trial as to the video and said, look, I've got Parkinson's. I shake a lot. I just happened to stop at that point. I really didn't intend anything. The video is the video. It's either lascivious or not lascivious. Would he have any shot at an acquittal with that particular defense? If the jury were to buy his credibility, then maybe he would. But it would still be a lascivious video under your argument. No matter what his intent was, it would still be lascivious. The camera work shows the intent and that is lascivious. I mean, there is no non-sexual purpose for zooming in, for videotaping. I'm hypothetical. He's a shaky, shaky camera person. He's just there and he's distracted and no intention really to do anything untoward. Well, if he's shaking, it wouldn't be a steady close-up view for five to six seconds of her pubic area. And there's no non-sexual purpose for videotaping a close-up, lingering view of a child's pubic area that's minimally closed. Your argument depends greatly on the intent of the photographer. Less on what the actual image is. No, it's based on both. It's based on the actual video itself and all the circumstances surrounding it. I think you can look at this video itself and see the clear lasciviousness from the video itself. But, of course, we don't have just the video itself. We also have all the circumstances surrounding the video, which include the other two photos of the child sitting on the couch. She's in her swimsuit bottom and her legs are spread open. Her knees are splayed outwards. And her swimsuit bottom is positioned in a way that part of her pubic area is exposed. And Mr. Hall took the photo from a side-view angle to ensure that the viewer could see the part of the pubic area that's exposed. And that informs the lasciviousness of the video, and it also informs the lasciviousness of the photographs themselves. And as Judge Clevenger pointed out, these are not the only circumstances that we have. We also have all the evidence surrounding the photographs, which include the child pornography search terms that he had on his phone and the other videos of this child that were taken on the camera. And my time has run out. Unless this Court has any further questions, we ask this Court to affirm the district court's sentence enhancement. Thank you. Thank you. Mr. Bashir, three minutes. Thank you, Your Honors. And just three brief points. First, the harm question that Judge Carnes was posing. This actually ties in exactly to where I think the logic of Holmes was getting to. Because Holmes, in talking about the subjective intent there, when you're so repetitiously filming women who are conducting their everyday activities or some of these other cases in examination rooms, and invading that privacy, exposing their nude bodies, and then putting that on the Internet, cropping it, doing other acts of that nature, that is exacerbating the harm. So to your harm point, I think that's where Holmes has its limitations. Because to Judge Carnes' other point recently, Judge Carnes to my left, I'm very dyslexic to my left here, is in dealing with all the hypotheticals that you're posing really do get to the heart of the issue here. There are some images that do not constitute a lascivious exhibition. Because if the government's argument, and as the hypotheticals are posing, any image, anyone can be tried for any image, and the government could stand up and argue that, well, there was an intent to sexualize, and there was an intent otherwise. But this Court and the Supreme Court has recognized that there are images that will appeal to those that are the pedophiles of the world, unfortunately. However, they do not constitute illegal. Speaking for myself, I think the government has a very weak case on the video. I think they have a stronger argument on the photograph. So if you would address that briefly. Yes. And that actually ties in perfectly to the third point, because I think the government is overstating the contextual aspect here, because the context is very we can see from the record. These are not the images. These pictures were not part of the charge conduct, though they were part of the search warrant otherwise. They were not used to score any possession. The government did not indict, and not until an 11th-hour play were these pictures even brought into the foray. So when we're talking about the context and what are the surrounding circumstances under Smith's case here, the surrounding circumstances show that law enforcement and the government quite actually thought this was did not rise to the level, did not meet the line of child pornography. And as far as the findings of unnatural contact can't make lascivious subject matter non-lascivious. It is what it is. The fact that the government chose not to charge or the fact that the government brought this up late in the game can't undo what has been done. I would agree with that on both sides of the coin. In the context, to me, the context that's important here is the reason for the photograph, the mind of the photographer, and the context in which the photos were found, which is harmful to your case. Well, and I see my time has expired. If I can just answer that one question. The reason that that context and, to Judge Carr, why this is important is if you look at the charge conduct, you actually had evidence and you had factual findings, admitted findings that there was underwear pulled, pants put over, positioning otherwise. You don't have that in this instance. So there is a distinction. And the distinction is on the record itself. And I see my time has concluded. Thank you, Your Honors. Thank you. Take that case under submission. The next case is United States v. Connage. I will say for the benefit of our visitors that the next case involves an issue